UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PAUL FINE JR.,
    *Plaintiff*,

v().

UCONN MEDICAL, *et al.*,
    *Defendants*.

No. 3:18-cv-530 (JAM)

**INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A**

Plaintiff Paul Fine, Jr., is a sentenced prisoner in the custody of the Connecticut Department of Correction. He has filed an amended complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983. After an initial review, the Court concludes that the complaint should be served on some of the named defendants as set forth in the ruling below.[1]

**BACKGROUND**

Fine names many defendants, including UConn Medical Farmington CT; Dr. Ricardo Ruiz; Nurse Jane Ventrella; Male Nurse J. Carrara; Captains Watson and Lugo; Lieutenants Mazurek, Marquis, Johnson, and Boyd; Correctional Officers Wagner and Johnson; DR Investigator Wright; Grievance Coordinator Boyd; Correctional Officers Adams, Whitehead, St. John, Deveau, and Leone; CERT Team Correctional Officers Reyas, Lytell, Johnson, and Stolfi; Boswell; Bachi; Edwards; and numerous "John Doe" defendants.

Fine has filed an initial and amended complaint. Docs. #1 and #23. His complaints run many pages in length and combine scores of allegations in a sometimes confusing fashion. The

---

[1] The Court's conclusion that some of the claims may proceed does not foreclose any of the defendants from filing a motion to dismiss or a motion for judgment on the pleadings to the extent that they believe that the Court may have allowed one or more claims to proceed without an adequate factual basis in the pleadings. Similarly, to the extent that Fine may believe that the Court has overlooked or mischaracterized certain factual allegations that give rise to proper legal claims, then he may promptly file a motion for reconsideration within 14 days to seek modification of this ruling.

following facts are drawn from the complaints and accepted as true solely for purposes of this initial review order. First, I will review facts concerning Fine's medical complaints, and then I will review facts concerning other alleged misconduct by prison officials.

*Medical complaints*

Fine suffers from a lifelong seizure disorder which was diagnosed shortly after his incarceration in 1991. The condition causes him to suffer grand mal and lesser seizures which are often induced by stress. Doc. #23 at 6 (¶ 2). The Department of Correction has permanently assigned Fine to a bottom bunk because of the disorder. *Ibid.* (¶ 3).

Fine's condition was aggravated when he suffered head trauma while incarcerated. In 1991, correctional officers threatened him with force if he did not move to an upper bunk. *Ibid.* (¶ 4). Fine complied with the order. He had a grand mal seizure while in the upper bunk. Fine fell, shattering the porcelain toilet with his head and neck. *Ibid.* (¶ 5). He suffered a concussion and other injuries. *Ibid.* (¶ 6). He also was subjected to use of force in 2009 by officers who accused him of faking a seizure. *Id.* at 7 (¶¶ 7–8). These incidents have left him suffering psychological effects similar to PTSD. *Ibid.* (¶ 10).

Fine has submitted many complaints to UConn Medical because the medical unit at Cheshire Correctional Institution ("Cheshire") has not responded to his "serious medical inquiries and serious health concerns," including long-lasting migraine headaches, a painful, growing lump over his left eye, and psychotropic medication for "seizure proneality" as a result of a prior head injury. Doc. #1 at 11.[2] Neither UConn nor the Cheshire medical unit have addressed Fine's medical concerns about these conditions. *Id.* at 11–12. Fine believes that further

---

[2] Fine included the claims from the original complaint in the amended complaint and references the allegations in his requests for relief. For clarity, the Court includes the allegations as set forth in the original complaint.

investigation is necessary, such as an x-ray or MRI to determine the cause of the lump on his forehead. *Id.* at 12.

On April 3, 2017, Nurse Carrara refused Fine's request for x-ray or MRI, stating, "[N]o we don't do that here." Carrara also refused to permit him to see Dr. Ruiz and required him to sign to pay $3.00 for a box of ibuprofen that he could purchase at the commissary for $1.86. Fine filed a medical grievance against Carrara. *Ibid.*

On April 7, 2017, Nurse Ventrella called Fine to the medical unit to discuss withdrawing the grievance. Fine's knee was swollen, and he had to hop to the medical unit. *Ibid.* Ventrella gave him an ice pack for his swollen knee. Fine withdrew the grievance against Carrara because Ventrella stated that she would put him on the list to see Dr. Ruiz about his head issues. But Ventrella did not do so. *Id.* at 13. Fine then refiled the medical grievance against Carrara. *Ibid.* He then "signed himself up" to see Dr. Ruiz about his head and knee. He encountered difficulty from the medical unit when doing so. *Ibid.*

On April 12, 2017, correctional officers and a nurse in the housing unit twice told Fine that he had been called to the medical unit. After long waits in the medical unit, nurses told him that they did not call him. *Ibid.* At unspecified times, Fine experienced other "coincidental mishaps" that he perceives as intended to harass or aggravate him. *Id.* at 14. The Cheshire medical unit also refused to examine him for "musa" relating to the injury over his eye. *Ibid.*

Dr. Ruiz saw Fine for his injured knee on May 26, 2017, three months after Nurse Ventrella gave him the ice pack.[3] *Ibid*. Dr. Ruiz diagnosed a degenerative knee injury. He refused to issue Fine a knee brace, cane, crutch or ace bandage. *Id.* at 15. Over the years, Fine

---

[3] Although Fine states that he waited three months from the time he received the ice pack to see Dr. Ruiz, he alleges that Nurse Ventrella gave him the ice pack on April 7, 2017, less than two months before the examination by Dr. Ruiz.

3

saw other inmates with knee injuries receive braces, canes, ace bandages and pain medication. He had to purchase an ace bandage. *Ibid.*

Fine received a flyer stating that UConn Medical and the Cheshire medical unit were doing a psychological study on the effects of anger and frustration on older inmates and how the inmates dealt with being forced into difficult situations. The flyer solicited participation in the study. *Id.* at 16. Fine refused to participate but believes that he has been a non-consenting participant in the study. *Id.* at 16–17.

On August 28, 2017, Fine filed a medical grievance against Dr. Ruiz. When it was clear that Fine would continue to pursue the issue, Dr. Ruiz saw him and gave him an ace bandage that was too narrow for his injury. *Id.* at 17. Fine filed another medical grievance about the bandage. *Ibid.* Two days later he was called to the medical unit. Although he was the second inmate in line, behind another man of color, Fine was made to wait over an hour while four later-arriving inmates were seen. *Id.* at 17–18. He had to urinate but was denied permission to use the medical unit bathroom. When he returned to his housing unit to urinate, the nurse noted that he refused the ace bandage. *Id*. at 18.

Fine has a family history of colon cancer. He has developed "an internal condition" but is concerned that he will not receive proper treatment if he seeks medical assistance from the Cheshire medical unit. *Ibid*.

### *Additional misconduct*

Fine has filed lawsuits against correctional officers and medical staff at Cheshire and UConn for medical mistreatment, retaliation, and deliberate indifference. Doc. #23 at 8 (¶ 2). In Unit South 4, during mealtimes, defendant Reyas would close Fine's cell door, sometimes not letting him out to eat. Fine thought he was singled out as an example to the unit because another

4

inmate filed a misconduct complaint against defendant Reyas. *Ibid.* (¶ 3). This conduct continued until Fine wrote to the mental health unit asking how to handle an officer who locked him in his cell at mealtime. *Ibid.* (¶ 4).

Defendant Stolfi was working at MacDougall Correctional Institution and was named by Fine in a lawsuit filed in 2009. Defendant Stolfi was often present in South 4 when Fine was locked in his cell during mealtime. He also refused to permit Fine to leave his cell. *Id.* at 8–9 (¶ 5).

During this same time, defendant Lytell refused to permit Fine to leave his cell for his work assignment as a "tierman" or to obtain his medications at medication call. *Id*. at 9 (¶ 6). When defendant Lytell was in South 4, Fine was regularly mistreated to elicit a negative response. When Fine did not respond, defendant Lytell let inmates not on Fine's work detail out of their cells to create conflict and antagonize him. *Ibid.* (¶ 7). Defendant Lytell fired Fine from his job and told him to write to the unit counselor if he wanted the job back. *Ibid.* (¶ 8).

Officer Lytell had CERT Team Officer Johnson search Fine's cell and threaten to send him to segregation. Johnson announced to the unit that the cell search was in retaliation for Fine writing a grievance against defendant Lytell. *Id.* at 10 (¶ 10). Defendants Lytell and Johnson ordered Fine to pack his property and wait for hours to be sent to segregation. At the end of their shift, they laughed at him and did not send him to segregation. *Ibid.* (¶ 11). This harassment was in retaliation for Fine writing to the unit counselor to keep his job, an action defendant Lytell directed him to take. *Ibid.* (¶ 12).

On June 23, 2018, Fine was involved in a minor fight in South 4. Immediately thereafter, Officer Adams handcuffed him in the presence of the entire unit and took him to segregation. *Id.* at 11 (¶ 14). There was no time after the fight for Fine to hide anything in his rectum. Nothing

5

occurred during recreation that would suggest such an action, and Fine has no history of concealing contraband in his rectum. Nothing occurred that would cause correctional staff to suspect such conduct. *Ibid.* (¶ 15).

Upon reaching segregation, Fine was ordered to undergo a strip search. The search was conducted in the presence of heterosexual and homosexual male correctional staff and homosexual male nurses. He was required to bend and spread his buttocks. Fine considered this action "an extremely sexualized and offensive act in submi[ss]ion to authority not as standard professional DOC policy . . . as a humiliation." *Ibid.* (¶ 16). He did not refuse the naked strip search on camera but did refuse to bend and spread his buttocks. Defendant Whitehead threatened him for refusing. *Id.* at 11–12 (¶ 18).

Fine was shackled in black box wrist restraints as punishment. He was unable to move his arms. His hands and feet were restrained for three days. At no time were the restraints removed to permit him to urinate of defecate. *Id.* at 12 (¶ 19). Defendant Lieutenant Marquis left Fine in a cell with his clothing, blanket, and mattress urine-soaked for three days. *Ibid.* (¶ 20). When Fine asked Marquis to uncuff his wrists so he could urinate, defendant Marquis told him that he was smart and "good with lawsuits" so he could find a way to uncuff himself. *Ibid.* (¶ 21). Marquis further humiliated Fine by calling him "Pee pants" and directing the other officers and inmates in segregation to use that nickname. *Ibid.* (¶ 22). Inmates released from segregation and correctional staff told South 4 about the incident. *Id.* at 13 (¶ 24).

Marquis along with nurses and officers, including some named in the original complaint, checked on Fine during the three days. *Ibid.* (¶ 27). The nurses refused to intervene on Fine's behalf or acknowledge any risk to his health as an older inmate on seizure medication by constant exposure to urine. *Id.* (¶ 28). The nurses also pretended not to see cuff bruising on his

6

wrist. *Id.* at 14 (¶ 29). They refused to treat the bruises, provide medication for intense headaches, or acknowledge his complaints of difficulty breathing. *Ibid.* (¶ 30).

On July 6, 2018, defendant Segregation Officer Boswell took a grievance Fine had written against Marquis. Boswell brought the grievance into the segregation office for review. *Ibid.* (¶ 31). While Fine was complaining to a nurse about his medical and other grievances, officers arrived at his cell. *Ibid.* (¶ 32). Fine was handcuffed and taken to D.O.S. status for mental health surveillance. The female nurse told him that he would be strip-searched again and would submit to spreading his buttocks. *Id.* at 15 (¶ 33).

When Fine realized that the search would be conducted in front of a female, he panicked and tried to pull away from the strip search area. He was punched in the face and thrown to the floor. *Ibid.* (¶ 34). Officers kicked him in the head and ear and sprayed a chemical agent into his eyes and ear canal. He was unable to hear in his left ear. *Ibid.* (¶ 35). After he was handcuffed and subdued, officers used their boots to apply pressure to nerves at his jawline, near his ear. *Ibid.* (¶ 36). Now Fine cannot chew without experiencing jaw pain. Nurses continue to refuse his request to see a specialist. *Ibid.* (¶ 37).

After Fine was subdued, a lieutenant yelled for him to stop resisting. Fine contends that this statement was made for the benefit of the camera to conceal the unwarranted use of force. *Id.* at 16 (¶ 39). A spit bag was placed over his head. He was not decontaminated. He was again shackled, hands and feet, with the black box wrist restraints. He was unable to raise his hands above his waist so could not rinse the chemical agent from his eyes on his own. *Ibid.* (¶ 41).

Fine was brought to a cell on "MHU D.O.S." status, thrown on the bunk, and stripped in front of two female officers. The black box restraints were reapplied, and the spit bag was removed. *Id.* at 17 (¶ 42). A mental health unit intern told him that mental health staff would see

him the following morning. *Ibid.* (¶ 43). The nurses who viewed the incident said nothing. *Ibid.* (¶ 44).

The following morning, Fine woke to hear a Jamaican officer telling inmates that he deserved what had happened because he was a child molester. This was not true. *Ibid.* (¶ 46). The Jamaican officer had transferred from MacDougall Correctional Institution with defendant Stolfi and was aware of Fine's 2009 lawsuit. *Id.* at 18 (¶ 47). Inmates in segregation began calling Fine "ripper," "child molester," and "pee pants." They spread these rumors throughout the east block using the air vents. *Ibid.* (¶ 49). Inmates spit and urinated on him through holes in the cell walls. They pounded on the metal walls and called him names at all hours of the night. *Ibid.* (¶ 50). Correctional staff called him a child molester and turned on the light in his cell during the night. *Id.* at 19 (¶ 51).

During this time, nurses ignored Fine's request for assistance with bruised wrists, decontamination, and his inability to hear. *Ibid.* (¶¶ 52–53). Fine requested a transfer to another cell. Three correctional officers and two lieutenants refused the request. *Ibid.* (¶ 54).

On July 10, 2018, defendant Disciplinary Investigator Wright met with Fine to discuss the segregation-related incidents from June 23, 2018, through July 10, 2018. Defendant Wright was not sympathetic to his injuries. *Id.* at 20 (¶ 55). Fine signed the disciplinary ticket to minimize his time in segregation. He wanted to be released so he could file grievances and obtain medical attention. *Ibid.* (¶ 56). While in segregation, he was unable to contact a Connecticut State Trooper to file criminal charges. *Ibid.* (¶ 57).

When Fine told defendant Wright about the harassment by other inmates, Wright acknowledged that the inmates involved were troublesome. At first, he agreed to have Fine transferred to another cell, but later refused to do so. Fine remained in the segregation cell for

four more days. *Id.* at 21 (¶ 58). On his last day in segregation, Wright advised plaintiff not to remain "here" because he had no friends. *Ibid.* (¶ 59). Fine understood this statement as a warning that his safety would be in jeopardy. *Ibid.* (¶ 60).

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the compliant, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a pro se complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

As an initial matter, Fine has named all defendants in their individual and official (professional) capacities. The only form of relief he seeks is money damages, and absent a waiver the Eleventh Amendment bars claims for money damages against state officials in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Accordingly, Fine's

9

claims against defendants may proceed in their individual capacities only, and all official capacity claims are dismissed pursuant to 28 U.S.C. § 1915A(b)(2).

Similarly, Fine names a state agency—UConn Medical—as a defendant. A state agency or entity is not subject to suit under 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989); *Ferla v. Correctional Managed Health Care*, 2015 WL 5826812, at *2 (D. Conn. 2015). Accordingly, Fine's claim against UConn Medical will be dismissed.

The amended complaint asserts numerous federal and state law claims. Because some of these claims as listed by Fine overlap with one another, I will address what I understand to be Fine's claims in terms of the types of legal violations that he alleges.

### *Deliberate indifference to serious medical needs*

The Eighth Amendment prohibits prisons officials from being deliberately indifferent to the serious medical needs of prisoners in their custody. *See Estelle v. Gamble*, 492 U.S. 97, 104 (1976). A prisoner who claims deliberate indifference to a serious medical need must satisfy two requirements. First, there is an objective requirement—that the prisoner's medical need was sufficiently serious (*i.e.*, that the prisoner suffered from an urgent medical condition involving a risk of death, degeneration, or extreme pain). *See Spavone v. New York State Dep't of Corr. Serv's.*, 719 F.3d 127, 138 (2d Cir. 2013); *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011). Second, there is a subjective requirement: that the defendant have acted recklessly (*i.e.*, with an actual awareness of a substantial risk that serious harm to the prisoner would result from the defendant's action or non-action). *See Spavone*, 719 F.3d at 138. It is not enough to allege simple negligence or negligent medical malpractice; instead, a prisoner must show that the defendant acted with the equivalent of a criminally reckless state of mind with respect to the prisoner's medical needs. *See Hilton v. Wright*, 673 F.3d 120, 122–23 (2d Cir. 2012); *Collazo v. Pagano*,

656 F.3d 131, 135 (2d Cir. 2011) (*per curiam*).

Fine alleges that he suffers from a seizure disorder, PTSD, severe migraine headaches, a knee injury, and a painful lump on his forehead. Fine has alleged enough facts to establish for now that he had a serious medical need. *See Moriarity v. Neubold*, 2004 WL 288807, at *2 n.2 (D. Conn. 2004) (migraine headaches constitute serious medical need if "extremely painful and debilitating"); *McGee v. Pallito*, 2014 WL 360289, at *7 (D. Vt. 2014) (back and knee pain combined with migraines might rise to the level of serious medical need).

Fine complains that Dr. Ruiz failed to provide timely and adequate care for his knee condition. Doc. #1 at 14-15. According to Fine, it took three months for Dr. Ruiz to see him, and Dr. Ruiz failed to give him any treatment at all for his knee, telling Fine that because of his age he had a degenerative knee injury and then lying several times to Fine in order to get him out of his office. *Id.* at 15. Because of Dr. Ruiz's failure to give him any treatment, plaintiff had to buy his own ace bandage for the knee, all the while seeing other inmates receive treatment for injured knees. *Ibid.* Because these facts are enough at the initial pleading stage to suggest more than mere medical negligence, the Court will allow Fine's claim for deliberate indifference against Dr. Ruiz to proceed.

Fine alleges that Nurse Ventrella persuaded him to withdraw a medical grievance against Nurse Carrara by promising to schedule treatment and then reneging on that promise. *Id.* at 21. To the extent that this allegation may be construed to allege that defendant Ventrella affirmatively acted to prevent needed medical care, this claim shall proceed. To the extent, however, that Fine more generally and conclusorily alleges that Ventrella created a policy enabling medical personnel to remain silent when they observe deliberate indifference to medical needs or retaliatory conduct, I conclude that Fine has not alleged enough facts to allow this

11

aspect of his claim to proceed.

Fine alleges that Nurse Carrara improperly diagnosed him as not needing an x-ray or MRI despite his history of head trauma and migraine headaches lasting two days and longer. *Id.* at 22. Because these allegations of a wrong diagnosis suggest nothing more than negligence or medical malpractice, Fine's claim against Nurse Carrarra for deliberate indifference to medical needs shall be dismissed.

The complaint includes fifteen "John/Jane Doe" defendants who were nurses. Because Fine has neither identified these nurses nor adequately alleged how they were deliberately indifferent to his medical needs, this aspect of the deliberate indifference to medical needs shall be dismissed.

### *Deliberate indifference to safety*

"A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). A claim for deliberate indifference to safety has an objective and subjective component. The plaintiff must allege and prove that the harm was objectively serious, and that the charged officials "act[ed] or fail[ed] to act while actually aware of a substantial risk" of that serious harm. *Spavone*, 719 F.3d at 138.

Fine alleges that defendants Reyas, Lytell, CERT Team Johnson, Stolfi, and Grievance Coordinator Boyd were deliberately indifferent to his safety. Fine alleges that defendants Reyas, Lytell, Johnson, and Stolfi remained silent while his rights were violated, locked him in his cell during mealtimes, and did not allow Fine out of his cell to work at his prison job or to get his medication. Fine contends that defendant Boyd denied his grievances complaining about this conduct and created an environment in which employees were "permitted or encouraged to look

the other way, and remain silent" when inmates are injured. Doc. #23 at 30–31. Fine also alleges that these defendants denied him food and medication, which is conduct that could seriously jeopardize his safety. Fine alleges that the defendants did this solely to antagonize him or to make an example of him for the benefit of the housing unit, not for any legitimate penological reason. Doc. #23 at 8–13. The Court concludes that these allegations suffice to permit this deliberate indifference to safety claim to proceed.

Fine alleges that Marquis denied his requests to be permitted to use the toilet and was responsible leaving him restrained in urine-soaked clothing and bedding for three days. Fine further alleges that, when Fine prepared a grievance against him, Marquis had him transferred to "MHU D.O.S." where he was subjected to inmates urinating and spitting on him through holes in the cell walls. *Ibid.* These allegations are sufficient for this claim to proceed against defendant Marquis. *See Willey v. Kirkpatrick*, 801 F.3d 51, 66–68 (2d Cir. 2015) (discussing standard for violation of Eighth Amendment from exposure to unsanitary conditions of confinement).

### *Excessive force*

The Eighth Amendment prohibits the use of excessive force against a prison inmate. "Although not every malevolent touch by a prison guard gives rise to a federal cause of action, inmates have the right to be free from the unnecessary and wanton infliction of pain at the hands of prison officials." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (internal quotations and citations omitted). In order to state an Eighth Amendment claim for the use of excessive force, an inmate must allege a sufficiently serious use of force that has been inflicted for malicious or sadistic reasons rather than in a good faith effort to maintain or restore discipline. *Ibid.*; *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016). Liability can stem from an officer using excessive force him or herself, or from not intervening when he is in a position to observe the conduct and has

13

time to intervene. *See Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (noting that "a police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it").

Fine alleges that excessive force was used against him on and around July 6, 2018, when he was held in black box restraints for three days. He alleges that he was "violently beaten—punched in the face, then thrown on the floor," and that defendants continued to use force after he was subdued and handcuffed. Doc. #23 at 15–16. He alleges that they sprayed chemical agent into his eyes and ear canal and shoved their boots "into ears and jawline nerves," causing him to yell in agony. *Ibid.*

Fine has alleged conduct that states a plausible claim for excessive force, but he has failed to allege who did what with adequate specificity to give notice to defendants. Fine lists eighteen named defendants and ten John Doe defendants under the excessive force heading in his complaint. His accounts of these incidents involving the use of force refer to the perpetrators only as "the officers," without any indication of which officers were personally involved in the use of force or in a position to intervene. Having named so many defendants, it is implausible that they were all present when excessive force was allegedly used, and the Court cannot infer that they were present based solely on the fact that their names appear under the "excessive force" heading. When Fine does refer to individual officers, such as when he states that Officer Boswell escorted him to the shower on the day in question, it is unclear from the narrative if those officers were still present when the incidents of force occurred. *Id*. at 14. Similarly, a note next to Lt. Boyd's name at the start of the complaint reads "maced by," *id.* at 5, but Lt. Boyd is not mentioned in the portion of the complaint in which Fine describes being sprayed with mace,

14

*see id.* at 15. And while Fine states that Officer Stolfi was "working in the segregation unit" on July 6, 2018, and "fully aware of Paul Fine in Cell #14," *id.* at 14, he has not alleged any facts to suggest that Stolfi was aware of the use of excessive force or in a position to prevent it.

Taken as true, the conduct Fine alleges suggests an intent to harm rather than a good-faith effort to maintain discipline. I will allow Fine's excessive force claims to proceed against the John Doe defendants, but the burden will be on him to identify the John Doe defendants before the statute of limitations expires. This ruling is without prejudice to Fine filing an amended complaint making clear which of the named defendants used excessive force or were present and in a position to intervene to prevent the use of excessive force.

### *Strip searches*

A prisoner's claim that he has been subject to a strip search may implicate the Fourth Amendment right to be free from an unreasonable search and seizure. *See Harris v. Miller*, 818 F.3d 49, 56–57 (2d Cir. 2016) (*per curiam*). For purposes of a Fourth Amendment claim, a court should consider whether the inmate has exhibited an actual, subjective expectation of bodily privacy and whether prison officials had sufficient justification to intrude on the inmate's privacy. *Id.* at 57, 62–63. To determine if there was sufficient justification, courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *Id.* at 58, 63 (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Strip searches are an invasion of privacy, and more so if conducted by prison officials of the opposite gender or if conducted in the presence of persons whose presence is not necessary to the search. *Id.* at 62–63.

Fine alleges that he was subject to strip searches without good reason that involved the presence of officers of the opposite gender and who did not need to be present. The Court will

allow this claim to proceed against Officer Whitehead, who Fine alleges threatened him for refusing to spread his buttocks, and Officer Adams, who Fine alleges escorted him to segregation and the Court infers was present for the search.

*First Amendment retaliation*

The First Amendment protects prison inmates from being subject to retaliation on the basis of an inmates' filing of a lawsuit, lodging a grievance, or engaging in other protected free speech activity. In order to state a claim for First Amendment retaliation, a prisoner plaintiff must allege facts showing (1) that he engaged in activity that is protected under the First Amendment, (2) that a prison official defendant took an adverse action against him, and (3) that the prisoner's First Amendment activity caused the prison official to engage in the adverse action. *See, e.g.*, *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015). The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Id.* at 295 (internal quotations omitted).

Fine alleges that defendant Stolfi was named in a prior lawsuit he filed in 2009 and that defendant Doe worked with defendant Stolfi at MacDougall Correctional Institution when that lawsuit was pending. He also alleges specific retaliatory actions committed by each defendant (such as Stolfi's locking him into his cell at mealtimes and Doe labeling him as a child molester). The Court will permit Fine's claim for retaliation against defendants Stolfi and Jamaican officer Doe to proceed.

Fine's allegations also support retaliation claims against defendants Lytell and CERT Team Officer Johnson regarding harassment and search of Fine's cell in retaliation for a

grievance filed against defendant Lytell, and against defendants Ruiz and Carrara for denying medical treatment in retaliation for Fine's medical grievances. I will allow these retaliation claims to proceed as well.

### *State law claims for assault, battery, intentional infliction of emotional distress, and violation of the state freedom-of-information statute*

The Court limits its review for purposes of 28 U.S.C. § 1915A to federal law claims. That is because the core purpose of an initial review order is to make a speedy initial screening determination of whether the lawsuit may proceed at all in federal court and should be served upon any of the named defendants. If there were no facially plausible federal law claims against any of the named defendants, then the Court would decline to exercise supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367. *See also Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 165–66 (D. Conn. 2005). Because Fine has asserted facially plausible federal law claims, the validity of his accompanying state law claims may be appropriately addressed in the usual course by way of a motion to dismiss or a motion for summary judgment. To the extent that Fine relies merely on defendants' failure to comply with prison regulations or other administrative directives, there is no basis for relief because a prison official's violation of a prison regulation or policy does not establish that the official has violated the Constitution or is liable to a prisoner under 42 U.S.C. § 1983. *See, e.g.*, *Harris v. Taylor*, 441 F. App'x 774, 775 (2d Cir. 2011).

## CONCLUSION

The claims against defendant UConn Medical and the claims against all defendants in their official capacities are DISMISSED pursuant to 18 U.S.C. § 1915A(b). As to defendants in their individual capacities, the case will proceed on the deliberate indifference to medical needs claims against defendants Ruiz and Ventrella; the deliberate indifference to safety claim against

defendants Reyas, Lytell, Stolfi, CERT Team Officer Johnson, and Grievance Coordinator Boyd; the conditions of confinement claim against Lieutenant Marquis; the excessive force claim against John Doe defendants 1–10; the Fourth Amendment strip search claim against officers Adams and Whitehead; and retaliation claims against defendants Stolfi, Jamaican officer Doe, Lytell, CERT Team Officer Johnson, Ruiz, and Carrara. Plaintiff's supplemental state law claims will proceed as well.

The Court enters the following orders:

(1) **The Clerk shall** verify the current work addresses of defendants Stolfi, Lytell, CERT Team Officer Johnson, Ruiz, Ventrella, Carrara, Reyas, Grievance Coordinator Boyd, Lieutenant Marquis, and Correctional Officers Adams and Whitehead with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet, containing the Complaint, Amended Complaint, and this Order, to each defendant at the address provided within **twenty-one (21) days** of this Order, and report to the Court on the status of those waiver requests on the thirty-fifth day after mailing. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on the defendant in his or her individual capacity and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(2) **The Clerk shall** send plaintiff a copy of this Order.

(3) **The Clerk shall** send a courtesy copy of the Complaint, Amended Complaint, and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(4) The defendants shall file their response to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent. If they choose

to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above. They also may include all additional defenses permitted by the Federal Rules.

(5) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this order. Discovery requests need not be filed with the Court.

(6) All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this order.

(7) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(8) If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that plaintiff MUST notify the Court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. Plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If plaintiff has more than one pending case, he should indicate all case numbers in the notification of change of address. Plaintiff should also notify the defendant or the attorney for the defendant of his new address.

(9) Plaintiff shall utilize the Prisoner Efiling Program when filing documents with the Court. Plaintiff is advised that the Program may be used only to file documents with the Court. As local court rules provide that discovery requests are not filed with the Court, discovery requests must be served on defendants' counsel by regular mail.

(10) Plaintiff has included twenty-seven defendants identified only as John or Jane

Doe. Plaintiff shall obtain the names and current work addresses for the John and Jane Doe defendants through discovery and file a Second Amended Complaint that includes the identities of the Doe defendants in the case caption, includes all of the claims permitted to proceed in this Order and includes specific allegations describing the actions of each defendant and showing how that defendant was involved in one or more of the claims in this case.

    **SO ORDERED** this 16th day of January 2019 at New Haven, Connecticut.

    /s/ *Jeffrey Alker Meyer*
    Jeffrey Alker Meyer
    United States District Judge